**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **CRAIG SCHNAPPINGER,** on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>**NORDVPN S.A.,**<br><br>and<br><br>**TEFINCOM S.A. D/B/A NORDVPN,**<br><br>     Defendants. | Case No.: 1:26-cv-00982<br><br>**JURY TRIAL**<br><br>**DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Craig Schnappinger ("Plaintiff"), by his undersigned attorneys Wise Law Firm, PLC, Bryson, Harris, Suciu, & Demay, PLLC and Wittels McInturff Palikovic, brings this consumer protection action in his individual capacity and on behalf of classes of Virginia and North Carolina consumers defined below (the "Classes") against Defendants Nordvpn S.A. and Tefincom SA d/b/a NordVPN (hereafter, "Defendants," "Nord Security," or the "Company"), seeking damages from Defendants resulting from Defendants' unlawful, unfair, and deceptive acts and practices with respect to the sale and advertisement of its products and services, as follows:

**INTRODUCTION**

1.    This is a proposed class action lawsuit challenging Nord Security's use of unfair and deceptive "automatic renewal" tactics to trick consumers into paying for unwanted, pricey subscriptions for internet security services. Nord Security intentionally misleads consumers into thinking that they can subscribe to Nord Security's virtual private network and other services for

a discrete period of time. The truth, however, is that Nord Security's "disclosures" regarding the automatically renewing feature of its subscriptions are hidden from consumers both before and after purchasing a subscription and fall far short of the legal requirements for such subscriptions. Further, Nord Security intentionally makes those subscriptions difficult to cancel.

2.    Nord Security offers a suite of products and services that claim to provide internet users with privacy and protection from cybersecurity threats. Those offerings include a virtual private network ("VPN") service called "NordVPN,"[1] a password manager called "NordPass," and an encrypted cloud storage service called "NordLocker." These products and services are referred to herein as the "Nord Subscriptions."

3.    Potential customers are directed to Nord Security's various sales websites through online searches, its sponsorship of influencers, or by advertising for the Company's VPN and/or other services. Nord Security advertises widely online and on dozens of podcasts. Nord Security's advertising touts the benefits that its services allegedly offer the prudent consumer; for example, the Company claims that its VPN service provides consumers "safe and private access to the internet" and that it is "trusted by tech experts and users."

4.    While consumers enroll in Nord Security's privacy and security products and services, unbeknownst to these consumers Nord Security is actually collecting consumers' payments and payment information via unfair and deceptive subscription practices designed to entrap consumers into paying unlawful, unknown and/or unwanted recurring subscription fees.

---

[1] A VPN service is one that purports to protect a user's internet connection and online privacy. These services typically route a user's internet traffic through an encrypted tunnel to a server in another location, masking the user's location and protecting the user's data from interception along the way. Uses for VPNs range from casual entertainment (i.e., using a VPN while abroad to watch a show that is only available in the U.S.) to the distribution of politically significant information (i.e., masking journalistic sources within a totalitarian regime).

5.      The Nord Subscriptions use a "negative option" billing tactic, which the Consumer Financial Protection Bureau ("CFPB") defines as "a term or condition under which a seller may interpret a consumer's silence, failure to take an affirmative action to reject a product or service, or failure to cancel an agreement as acceptance or continued acceptance of the offer."[2] The CFPB cautions that "[n]egative option programs can cause serious harm to consumers," which "is most likely to occur when sellers [1] mislead consumers about terms and conditions, [2] fail to obtain consumers' informed consent, or [3] make it difficult for consumers to cancel."[3]

6.      Nord Security's subscription scheme hits the CFPB's warning trifecta. Due to Nord Security's unfair and deceptive negative option practices, many consumers who sign up for a Nord Security service ultimately end up paying for unfair, deceptive, and unlawful subscriptions that they do not want.

## THE UNIFORM WEB OF NORD SECURITY'S NEGATIVE OPTION SCHEME

7.      Nord Security traps consumers into becoming full-fledged customers with a web of deceptive online design features that exploit well-known shortcomings in consumer decision-making. The paragraphs below describe the various ways in which Nord Security employs deception in the structure of its offerings. While Nord Security's unlawful, unfair, and deceptive web has several components that can independently trip up consumers and lead to inadvertent purchases, taken together these components form an intentionally deceptive architecture that is designed to, and does, produce a predictable and unlawful outcome: saddling unwitting consumers with unwanted subscription charges.

---

[2] Consumer Financial Protection Circular 2023-01, Unlawful negative option marketing practices (Jan. 19, 2023), https://files.consumerfinance.gov/f/documents/cfpb_unlawful-negative-option-marketing-practices-circular_2023-01.pdf.

[3] *Id*. at 2.

8.      Nord Security deceives consumers in at least six ways.

9.      First, during the enrollment process, Nord Security fails to clearly and conspicuously disclose the material terms of the automatic renewal that consumers are intended to rely on when signing up for a Nord Subscription, including how to cancel. For example, instead of clearly explaining to the consumer what they are actually getting into, Nord Security requires customers to scroll to find the relevant (and inadequate) fine print on its payment page and buries its key autorenewal provisions in confusing, inconsistent, and inaccurate terms scattered across multiple sections of at least two fine print documents. Nor does Nord Security obtain consumers' affirmative consent to the automatic renewal offer prior to charging consumers' payment cards or third party accounts.

10.     Second, Nord Security's scheme continues post-sign up. The Company's receipt and acknowledgement emails sent to consumers after they enroll in a Nord Security subscription contain no information whatsoever on how to cancel a subscription, no contact information for Defendants, and fails to make other required disclosures under Virginia law.

11.     Third, Nord Security makes canceling exceedingly difficult and requires customers to figure out—with no help from the Company—that to Defendants, cancelling means the entirely unorthodox process of navigating Nord Security's account settings to find a buried feature labelled "Auto-renewal" and turning it to "OFF" (rather than, for example, by clicking a button clearly and prominently labelled, "CANCEL SUBSCRIPTION"). Nor does Nord Security offer a conspicuous online option to cancel Nord Subscriptions.

12.     Fourth, Nord Security fails to provide sufficient notice under North Carolina and Virginia law that the customer's subscription will automatically renew. Under North Carolina law, Nord Security fails to provide this notice at least 15 days, but no earlier than 45 days, before the

4

subscription automatically renews, because it does not clearly and conspicuously disclose that the Nord Subscription will automatically renew unless canceled and the date by which consumers must cancel to avoid further charges. Under Virginia law, Nord Security fails to provides this notice at least 30 days, but no earlier than 60 days, before the subscription automatically renews for the same reasons the notice fails under North Carolina law, and because it does not provide a copy of the automatic renewal offer provisions.

13. Fifth, Nord Security employs a highly unconventional charging practice. Rather than automatically renew consumers by charging their stored payment methods at the beginning of a new subscription period if they do not cancel before the prior subscription is over, Nord Security extracts its charges 14 days *before the customer's current subscription period even ends*. By doing so, Nord Security locks consumers into another yearlong subscription well before any reasonable consumer would expect such a subscription to renew, allowing Nord Security to collect and keep payment from consumers who do not wish to remain Nord Security customers.

14. Sixth, Nord Security fails to clearly and conspicuously disclose material changes to its customers' automatic renewal terms, and further fails to provide any information whatsoever about how to cancel a subscription in connection with material change communications.

15. Again, while a given customer may not be ensnared by each and every aspect of Nord Security's unlawful, unfair, and deceptive subscription web, all Nord Security customers face the same traps and need only be tricked by one to end up paying a hefty subscription renewal fee for a year (or more) of internet security and privacy services they do not want.

16. These outcomes are not only unsurprising but are in fact the result of Defendants' intentional, knowing, and bad-faith design choices. Defendants are well aware that their scheme is tricking customers, as complaints about Nord Security are legion, with hundreds of consumers

complaining directly to Nord Security or via sites like Trustpilot, SiteJabber, and Reddit. Upon information and belief, Nord Security experiences a high rate of chargebacks when consumers, frustrated by Nord Security's subscription scheme, initiate disputes through their credit card companies or other payment processors over unwanted Nord Security transactions. Upon information and belief, Nord Security has developed customer service protocols for dealing with customers complaining about unwanted subscription charges.

17.     Nevertheless, despite the clear messages Nord Security's customers are sending— over, and over, and over again—Nord Security continues to subject the consuming public to its unlawful subscription scheme and to reap significant monetary benefits from its improper conduct.

18.     Only through a class action can consumers like Plaintiff remedy Nord Security's unlawful, unfair, and deceptive practices. Because the monetary damages suffered by each customer are small in comparison to the much higher cost a single customer would incur in trying to challenge Nord Security's improper conduct, it makes no financial sense for an individual customer to bring his or her own lawsuit. Furthermore, many customers do not realize they are victims of Nord Security's unlawful acts and continue to be charged to this day. With this class action, Plaintiff and the Class seek to level the playing field, enjoin Nord Security's unlawful, unfair, and deceptive business practices, and recover the charges Nord Security has imposed on them in violation of the law.

### JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over Defendants because they conduct substantial business in Virginia, have sufficient minimum contacts with this state, and otherwise purposely avail themselves of the privileges of conducting business in Virginia by marketing and selling products and services in Virginia. Further, the injuries to Virginia consumers that Plaintiff seeks to prevent through public injunctive relief arise directly from Nord Security's continuing

conduct in Virginia, including, but not limited to, directing its subscription scheme at Virginia consumers.

20.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendants.

21.     This Court has original subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act. However, if the Court determines that it lacks original jurisdiction over any claim in this action, it may exercise supplemental jurisdiction over Plaintiff's claims under 28 U.S.C. § 1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged improper conduct occurred within this District, as Plaintiff resides in this District, and Defendants reside in this District for venue purposes. *Id.* § 1391(c)(2).

## **PARTIES**

23.     Plaintiff Craig Schnappinger is a citizen of Connecticut who resides in Fairfax County, Virginia.[4] While Plaintiff was stationed in Virginia, he enrolled in a Nord Security Subscription on approximately October 8, 2021.

24.     Plaintiff's Nord Security Subscription was automatically renewed twice, in 2023 and 2024, while he was stationed in North Carolina.

---

[4] At all times relevant to this action, Plaintiff was and is an active duty servicemember. Plaintiff retained his Connecticut domicile while stationed in Virginia and North Carolina pursuant to the Servicemembers Civil Relief Act, 50 U.S.C. § 4025.

25.     Plaintiff's Nord Security Subscription was automatically renewed again in 2025 after he was once again stationed in Virginia.

26.     Plaintiff is a consumer who was victimized by Nord Security's unlawful subscription scheme, suffered ascertainable injury in fact, and lost money because of Nord Security's violations of North Carolina and Virginia consumer protection statutes and the common law.

27.     Upon information and belief, with respect to all actions and decisions relevant to this action, Defendants along with non-Defendants NordSec Ltd. and Nord Security Inc. have operated as a single company called "Nord Security." Yet unbeknownst to the ordinary consumer, "Nord Security," is a brand and not a formal corporate entity.

28.     Defendants, along with non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc., hold themselves out to the public, including Plaintiff, as if a single fictitious entity called "Nord Security" sells the services to consumers in Virginia, North Carolina, and the rest of the United States for purchase. For example, when a consumer visits www.nordsecurity.com they see a typical company website with the "Nord Security" logo that features "our products" (including the products purchased by Plaintiff), "our story," "our team" and "our values." Similarly, when top U.S. venture capital firm Warburg Pincus and others invested $100 million in Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc., "Nord Security" issued a press release describing the funding as an investment in "Nord Security, a global leader in internet privacy and security solutions."[5] This same press release states that NordVPN is "the biggest and most popular VPN service in the world" and that "Nord Security was founded in

---

[5]     Nord Security raised another $100M investment round, NORD SECURITY, https://nordsecurity.com/blog/nord-security-raised-another-100m-investment-round.

Lithuania in 2012 by co-founders and co-CEOs Tom Okman and Eimantas Sabaliauskas."[6] Likewise, the "Corporate responsibility" page for "Nord Security" shows pictures of the founders and explains "our mission," and contains links to Nord Security's "corporate responsibility reports" and Nord Security's "Code of Conduct,"[7] which discusses such topics as expectations for the "Nord Security brand products, including NordVPN, NordPass, NordLocker, and NordLayer."[8]

29.    Defendant Nordvpn S.A. is a Panamanian corporation incorporated under the laws of Panama and its principal place of business is in Amsterdam, the Netherlands.[9] Nordvpn S.A. currently "offers" Defendant and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc.'s products "NordVPN, NordLocker, and NordPass."[10] NordVPN is one of the products Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. marketed and sold to Plaintiff in Virginia. Defendant Nordvpn S.A. also currently operates Defendants' and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc.'s, website, www.nordvpn.com.[11] Nordvpn S.A.'s corporate parents are non-Defendants NordSec B.V., NordSec Ltd, and Cyberswift B.V., which are also the corporate parents of non-Defendant NordSec Ltd.[12] Nordvpn S.A. shares an unnamed director with Defendant Tefincom S.A.[13]

---

[6] *Id.*

[7] Corporate Responsibility, NORD SECURITY, https://nordsecurity.com/corporate-responsibility.

[8] Code of Conduct, NORD SECURITY, https://res.cloudinary.com/nordsec/image/upload/v1712078877/nord-security-web/corporate/code%20of%20conduct/Nord_Security_Code_of_Conduct.pdf.

[9] *Zeichner v. Nord Security, Inc., et al.*, No. 24-cv-2462 (N.D. Cal.), Dkt. No. 39-1, ¶ 3.

[10] *Id.*

[11] *Id.*

[12] *Zeichner*, Dkt. No. 37.

[13] *Zeichner*, Dkt. No. 39-1, ¶ 8.

30.     Defendant Tefincom S.A. d/b/a NordVPN is a Panamanian corporation incorporated under the laws of Panama.[14] Tefincom S.A.'s principal place of business is Panama City, Panama.[15] Defendant Tefincom S.A.'s corporate parent is Stitching Raveset.[16] Defendant Tefincom S.A. was the original owner of the trademark for "NordVPN."

31.     Non-Defendant NordSec Ltd. is an internet privacy and security company headquartered in London, England.[17] NordSec Ltd. is a private limited liability company organized under the laws of England & Wales.[18] Defendant and non-Defendants NordSec Ltd. and Nord Security Inc. claim that NordSec Ltd. "once owned the intellectual property of the Nord brand."[19] NordSec's corporate parents are Cyberswift B.V., Cyberspace B.V., and Stalwart Holding B.V.[20] NordSec Ltd. is also an owner of non-Defendant NordSec B.V.,[21] Defendant Nordvpn S.A.,[22] and Nord Security Inc.[23] Public records indicate that NordSec Ltd. is a prior owner of the "NordVPN" trademark.

32.     Non-Defendant NordSec B.V. is an internet privacy and security company headquartered in Amsterdam, the Netherlands.[24] NordSec B.V. is a private limited liability

---

[14] *Zeichner*, Dkt. No. 39-3, ¶ 3.

[15] *Id.*

[16] *Zeichner*, Dkt. No. 38.

[17] *Zeichner*, Dkt. No. 39-5, ¶ 3.

[18] *Id.*

[19] *Zeichner*, Dkt. No. 39, at 5.

[20] *Zeichner*, Dkt. No. 35.

[21] *Zeichner*, Dkt. No. 36.

[22] *Zeichner*, Dkt. No. 37.

[23] *Zeichner*, Dkt. No. 27.

[24] *Zeichner*, Dkt. No. 39-2, ¶ 3.

company organized under the laws of the Netherlands.[25] Defendant and non-Defendants NordSec Ltd. and Nord Security Inc. claim that NordSec B.V. "currently owns the intellectual property" of the Nord brand.[26] NordSec B.V.'s corporate parents are NordSec Ltd. and two of NordSec Ltd's corporate parents, Cyberswift B.V. and Cyberspace B.V.[27] NordSec B.V. is also an owner of Defendant Nordvpn S.A.[28] and Nord Security Inc.[29] Defendants and non-Defendants NordSec Ltd. and Nord Security Inc.'s website www.nordsecurity.com claims that "Nord Security trademarks, trade names, company names, logos," whether registered or not, "as well as other Nord Brand features (such as Nord Security websites, applications and creative works embodied therein), are the exclusive property of NordSec B.V. ('Nord Security')."[30] NordSec B.V.'s marks include the marks "Nord Security," "NordVPN," "Nord," "NordSec," NordLocker," and "NordPass." Upon information and belief, the website Plaintiff used to enroll with Nord Security was the website owned by NordSec B.V. and the Nord Security products he purchased bore the "Nord Security," "NordVPN," "Nord," and "NordSec" marks owned by NordSec B.V.

33.    Non-Defendant Nord Security Inc. is a Delaware corporation.[31] Nord Security Inc.'s corporate parents are NordSec B.V., NordSec Ltd., and Cyberswift B.V.,[32] which is also a

---

[25] *Id.*

[26] *Zeichner*, Dkt. No. 39, at 5.

[27] *Zeichner*, Dkt. No. 36.

[28] *Zeichner*, Dkt. No. 37.

[29] *Zeichner*, Dkt. No. 27.

[30] Nord Security Trademark and Brand Guidelines, NORD SECURITY, https://nordsecurity.com/trademark-policy.

[31] *Zeichner*, Dkt. No. 27.

[32] *Id.*

corporate parent of NordSec B.V.[33] and NordSec Ltd.[34] Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. claim in a separate litigation that Nord Security Inc. is not the "Nord Security" that offers services to consumers like Plaintiff, instead claiming that Nord Security Inc. provides only business-to-business services.[35]

34.    Upon information and belief, at all times pertinent to this action, the finances, policies, and business practices of Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc., are and were dominated and controlled by one another in such a manner that each individual Defendant and each of non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. has no separate mind, will, identity, or existence of its own and instead operated as mere instrumentalities and alter egos of one another. For example, even though public records and fine print on the www.nordsecurity.com website indicate that non-Defendant NordSec B.V. owns the "NordVPN" trademark, the www.nordvpn.com website states that "NordVPN is owned and operated by nordvpn S.A."[36] Similarly, that same website also states that "[b]ack in 2012, two best friends sought to create a tool for a safer and more accessible internet. Driven by the idea of internet freedom, Tom Okman and Eimantas Sabaliauskas created NordVPN."[37] Tom Okman and Eimantas Sabaliauskas are listed as directors of NordSec Ltd., but their respective LinkedIn pages claim they are co-founders of "Nord Security."[38]

---

[33] *Zeichner*, Dkt. No. 36.

[34] *Zeichner*, Dkt. No. 35.

[35] *Zeichner*, Dkt. No. 39, at 5.

[36] The founders and owners of NordVPN, NORDVPN, https://support.nordvpn.com/hc/en-us/articles/20911146148113-The-founders-and-owners-of-NordVPN.

[37] *Id.*

[38] *See* https://www.linkedin.com/in/tokmanas/; *see also* https://www.linkedin.com/in/eimis/.

35.     Upon information and belief, Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. are so closely related in ownership and management, and each works closely in concert with the other, such that each has become the alter ego of the others, in that, among other things:

a.  Defendant and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc., operate and hold themselves out to the public as a single, fictitious entity, Nord Security.

b.  Defendant and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. operate and hold themselves out to the public in such a way that members of the public would be unable to identify and distinguish between one entity and another. For example, a consumer searching the internet for "NordVPN" would find www.nordvpn.com, which is owned and operated by Defendant Nordvpn S.A. but which Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. represent is the website of the non-existent entity "Nord Security." "Nord Security" is a trademark owned by NordSec B.V. The www.nordsecurity.com website, which Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. also represent is owned by the brand "Nord Security" similarly lists the various "Nord Security" products, including NordVPN.

c.  Defendant and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. do not market themselves independently.

d.  Olga Sinkeviciene, a director of NordSec Ltd., and Ruta Gorelcionkiene, a director of non-Defendant NordSec B.V., are both employees of CEOcorp, a company that "specializes in the incorporation of entities and implementation of corporate structures across diverse jurisdictions."[39]

e.  Upon information and belief, Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. share employees. For example, the LinkedIn pages of many of Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc.'s employees state that these employees work at "Nord Security," even though no such entity exists. When a prospective employee visits Defendant Nordvpn S.A.'s website www.nordvpn.com they are redirected to the "careers" subpage of www.nordsecurity.com (https://nordsecurity.com/careers). That page contains various claims and a video about what it is like to work at "Nord Security." Job applicants can apply for "Nord Security" positions available

---

[39] Services, CEOCORP, https://ceocorp.net/services/.

in Lithuania, Germany, Poland, the Netherlands, England, Spain, Japan, and remotely.

f.  When Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. issue press releases, they do so under the name "Nord Security" without identifying or distinguishing between corporate entities.

g.  On information and belief, there is a unified executive team that controls all operational and financial aspects of Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc.

36.   Both Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. have been represented by the same counsel in a case filed in California where non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. were also named as defendants. This same counsel also represents Defendants Nordvpn S.A. and Tefincom S.A. in cases filed in Colorado, Illinois, and Massachusetts, Defendant Nordvpn S.A. in a case filed in North Carolina, and Defendants Nordvpn S.A., Tefincom S.A., and non-Defendant NordSec B.V. in a case filed in New York.

37.   Defendants and non-Defendants NordSec Ltd., NordSec B.V., and Nord Security Inc. do business in Virginia and North Carolina under the name "Nord Security" and interacted with Plaintiff in Virginia and North Carolina such that his claims described herein arise from Plaintiff's contacts with Defendant and these non-Defendants in Virginia and North Carolina.

38.   Any such conduct of Defendant Nordvpn S.A., Defendant Tefincom S.A., non-Defendant NordSec Ltd., non-Defendant NordSec B.V., and non-Defendant Nord Security Inc. should be imputed to each other.

## FACTUAL ALLEGATIONS

**A.   Background on the Subscription e-Commerce Industry**

14

39.     The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[40] Subscription e-commerce services target a wide range of customers and cater to a variety of specific interests. Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years. As of 2022, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[41]

40.     In March 2023, one source noted that "[o]ver the past 11 years, subscription-based companies[] have grown 3.7x faster than the companies in the S&P 500."[42]

41.     The expansion of the subscription e-commerce market shows no signs of slowing. According to The Washington Post, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] . . . The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[43] 68% of consumers subscribed to something for the first time in 2024.[44]

---

[40] *See* Sam Saltis, *How to Run an eCommerce Subscription Service: The Ultimate Guide*, CORE DNA, https://www.coredna.com/blogs/ecommerce-subscription-services.

[41] Mary Mesienzahl, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it*, BUSINESS INSIDER (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[42] *The Subscription Economy Index*, ZUORA (Mar. 2023), https://www.zuora.com/wp-content/uploads/2023/03/Zuora_SEI_2023_Q2.pdf.

[43] Heather Long and Andrew Van Dam, *supra* note 35.

[44] Tien Tzuo, *They said subscriptions were doomed. The market said otherwise.*, ZUORA (Mar. 6, 2025), https://www.zuora.com/subscribed/they-said-subscriptions-were-doomed-the-market-said-otherwise.

42.      However, the subscription-based model also has are well-documented downsides. While the subscription e-commerce market has low barriers to entry, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[45] In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[46]

43.      Retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[47] As these companies have realized, "[t]he real money is in the inertia."[48] As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[49] That is, to garner more revenue, some companies, including Nord Security, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this by intentionally

[45] *Thinking inside the subscription box: New research on e-commerce consumers*, MCKINSEY & COMPANY (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[46] *Id.*

[47] Amrita Jayakumar, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets*, WASHINGTON POST (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[48] *Id.*

[49] Zoe Schiffer, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want*, BUSINESS INSIDER (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online- shopping-princeton-2019-6.

confusing users with their app's design and flow, … and other misleading tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs.[50]

44.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[51] Indeed, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to combat aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[52] Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts [and are] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[53] widespread utilization of these misleading "dark patterns" and deliberate omissions persist.

45.     The term "dark patterns" used herein is not a science fiction reference, but a term of art from the field of user experience ("UX"). The International Organization for Standardization (ISO) defines "user experience" as a "person's perceptions and responses that result from the use or anticipated use of a product, system or service."[54] Dark patterns in UX are "carefully designed misleading interfaces by UX design experts that trick the users into choosing paths that they didn't

---

[50] Sarah Perez, *Sneaky subscriptions are plaguing the App Store*, TECHCRUNCH (Oct. 15, 2018) https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store.

[51] Heather Long and Andrew Van Dam, *supra* note 35 ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also The problem with subscription marketing*, NEW MEDIA AND MARKETING (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing.

[52] *Id.*

[53] *Id.*

[54] *User Experience (UX): Process and Methodology*, UIUX TREND, https://uiuxtrend.com/user-experience-uxprocess/.

probably want to take, thus fulfilling the business objectives, completely ignoring the requirements and ethics of users."[55]

46.    The term "dark patterns" was first coined by cognitive scientist Harry Brignull, who borrowed from existing UX terminology. In UX, designers refer to common, re-usable solutions to a problem as a "design pattern," and conversely to common mistakes to solutions as "anti-patterns."[56] The term "dark patterns" was intended to "communicate the unscrupulous nature" of the design "and also the fact that it can be shadowy and hard to pin down."[57] The image on the following page provides some examples of commonly employed dark patterns:[58]

---

[55] Joey Ricard, *UX Dark Patterns: The Dark Side Of The UX Design*, KLIZO SOLS. PVT. LTD. (Nov. 9, 2020), https://klizos.com/ux-dark-patterns-the-dark-side-of-the-ux-design.

[56] Harry Brignull, *Bringing Dark Patterns to Light*, MEDIUM (Jun. 6, 2021), https://harrybr.medium.com/bringing-dark-patterns-to-light-d86f24224ebf.

[57] *Id.*

[58] Sarbashish Basu, *What is a dark pattern? How it benefits businesses- Some examples*, H2S MEDIA (Dec. 19, 2019), https://www.how2shout.com/technology/what-is-a-dark-pattern-how-it-benefit-businesses-with-some-examples.html.



47. The origin of dark patterns can be traced to the use of applied psychology.[59] In the 1970s, behavioral science sought to understand irrational decisions and behaviors and discovered that cognitive biases guide all our thinking. The image below provides examples of cognitive biases, including some that Nord Security exploits: [60]



48. But while the early behavioral research focused on understanding rather than intervention, later researchers, like Cass Sunstein and Richard Thaler (authors of the book *Nudge*)

---

[59] Brignull, *supra* note 56.

[60] Krisztina Szerovay, *Cognitive Bias — Part 2*, UX KNOWLEDGE BASE (Dec. 19, 2017), https://uxknowledgebase.com/cognitive-bias-part-2-fab5b7717179.

shifted focus and made the policy argument that institutions should engineer "choice architectures" in a way that uses behavioral science for the benefit of those whom they serve.[61]

49.    Another step in the development and application of such research is the use of A/B testing in UX. A/B testing is a quantitative research method that presents an audience with two variations of a design (version "A" and version "B") and then measures which actions they take (or do not take) in response to each variant.[62] UX designers use this method to determine which design or content performs best with the intended user base.[63] For example, a large health care provider might A/B test whether a website visitor is more or less likely to conduct a search of its doctors if the website's search function is labelled "SEARCH" versus simply identified by a magnifying glass icon.

50.    Unscrupulous UX designers have subverted the intent of the researchers who discovered cognitive biases by using these principles in ways that undermine consumers' autonomy and informed choice, and they used A/B testing to turn behavioral insights into strikingly "effective" user interfaces that deceive consumers in ways that are more profitable to the company applying them.[64] For example, dark patterns can be used to increase a company's ability to extract revenue from its users by nudging or tricking consumers to spend more money than they otherwise would, hand over more personal information, or see more ads.[65]

---

[61] Arvind Narayanan *et al.*, *Dark Patterns: Past, Present, and Future. The evolution of tricky user interfaces*, 18 ACM QUEUE 67-91 (2002), https://queue.acm.org/detail.cfm?id=3400901.

[62]    UXPin, *A/B Testing in UX Design: When and Why It's Worth It*, https://www.uxpin.com/studio/blog/ab-testing-in-ux-design-when-and-why/.

[63] *Id.*

[64] Narayanan *et al.*, *supra* note 61.

[65] *Id.*

51.     Nord Security has engaged in these unlawful subscription practices with great success. In 2023, Nord Security raised $100 million from investors, with the company valued at $1.6 billion.[66] Nord Security's products and services have over 15 million users, with "[m]ost of Nord Security's user base [] centered in the U.S."[67]

**B.      Nord Security's Unlawful, Unfair, and Deceptive Enrollment Process.**

52.     Upon information and belief, the Payment Page for Nord Security's enrollment process during the Class Period and that Plaintiff used in October 2021 was materially similar to the Nord Security Payment Page reproduced on the following page:

---

[66] Nord    Security    raised    another    $100M    investment    round,    NORD    SECURITY, https://nordsecurity.com/blog/nord-security-raised-another-100m-investment-round.

[67] Prarthana Prakash, *From bootstrapped to billions: How Nord spent 'hundreds of millions' minting VPN customers to become Lithuania's tech darling*, FORTUNE (April 30, 2025), https://fortune.com/europe/article/nord-vpn-hundreds-of-millions-minting-lithuania-tech-darling-unicorn/.



53.      The terms and conditions of Nord Security's automatic renewal offer are not presented to consumers "clearly and conspicuously," as required by the Virginia automatic renewal law, Va. Code Ann. 59.1-207.45 *et seq.* ("VA ARL") and North Carolina automatic renewal law, N.C.G.S. § 75-41 ("NC ARL"). The fine print below the solid black line that includes Defendants' (inadequate) "disclosures" about their automatic renewal offer is on Nord Security's payment screen but is not visible unless the consumer scrolls down to view it. The automatic renewal language is also not in larger type than the surrounding font. Instead, it is colored light gray rather than a more conspicuous color and is not set off from the surrounding text of the same size by symbols or other marks in a manner that clearly calls attention to the language. All the aforementioned intentional design choices made by Defendants violate the VA ARL and NC ARL. *See* VA ARL § *id.* § § 59.1-207.46.A.1 (barring companies like Nord Security from failing "to

23

present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the consumer becomes obligated on the automatic renewal or continuous service offer and in visual proximity . . . to the request for consent to the offer"); NC ARL § 75-41(a)(1) (requiring companies like Nord Security that offer automatically renewing contracts to "[d]isclose the automatic renewal clause clearly and conspicuously in the contract or contract offer").

54. Instead, the payment page's overall design, including the location of Defendants' supposed "disclosure," its font size, and color, deemphasize any notice text rather than make it ***conspicuous***. Defendants' automatic renewal terms are not in visual connection with the purchase terms and are instead buried at the bottom of the page, requiring consumers to scroll down to view them. This makes it unlikely reasonable consumers will even see the "disclosures" because they must scroll down to view them, they are presented in a light grey font against a lighter gray background, and are in a single-spaced format, which makes the "disclosures" difficult to read.

55. Further, because consumers must scroll down to view the automatic renewal terms, Nord Security's automatic renewal offer is not "in visual proximity" to its request for consumers to consent to the offer. VA ARL § 59.1-207.46.A.1.

56. Defendants' fine print also fails to disclose key details about Nord Security's subscription practices, including the cancellation policy and information on how to cancel. *Id.* § 59.1-207.46.A.1, 3; NC ARL § 75-41(a)(2).

57. Moreover, any supposed "disclosures" on the Nord Security payment page are far overshadowed by the page's other components in a clear demonstration of the "Misinformation" dark pattern. Defendants' payment page uses at least 12 different colors, presents information in

differently sized fonts and in various boxes, and includes hyperlinks, drop-down menus styled as hyperlinks, two call-outs for add-on products, and 13 different logos. In contrast, the automatic renewal terms are hidden at the bottom of the page, difficult to discern, and easy to miss, especially since consumers must scroll down on the screen to view them.

58.    Nord Security's "Order Summary" box likewise does not sufficiently present the terms and conditions of its automatic renewal offer to consumers, nor does it present the consumer with an easily accessible disclosure of the methods that the consumer may use to cancel the subscription.

59.    When a consumer selects a payment method on the payment screen (*e.g.*, credit card, Paypal, etc.), the payment method box expands, again failing to disclose Nord Security's autorenewal terms, let alone in a clear and conspicuous manner. The expanded payment boxes also do not present the consumer with any disclosure of the cancellation policy or the methods that may be used to cancel the subscription, let alone a method that is easily accessible.

60.    In sum, the Nord Security payment page fails to obtain consumers' affirmative consent to the automatic renewal terms and contains no mechanism for affirmatively consenting to the automatic renewal terms. For example, there is no checkbox that consumers must click to indicate that they accept those terms. *See* VA ARL § 59.1-207.46.A.2 (it is unlawful to charge consumers for an automatic renewal "without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms").

61.    Instead, Nord Security provides tiny, inconspicuous hyperlinks to "terms of service" and "terms" which themselves do not clearly and conspicuously explain the nature of Nord Security's automatic renewal offer or cancellation mechanism. Nord Security scatters confusing, inconsistent, and inaccurate provisions addressing these and other issues across

25

multiple sections of these documents (which total more than 9,500 words), burying them inconspicuously in dense surrounding text.

62.    For example, upon information and belief the then-most recent version of Nord Security's "terms of service" at the time Plaintiff enrolled in his Nord Security subscription contain a paragraph labeled "Auto-Renewal," which reads as follows:

> 3.2 **Auto-Renewal**. After the end of your Service period, your Subscription will automatically renew for the successive defined Service periods at the renewal dates, unless you decide to cancel the Subscription renewal before the day of the charge. If you do not cancel the Subscription in such due course, your chosen payment method will be charged the then-current renewal price for the upcoming defined Service period.

63.    This "Auto-Renewal" paragraph gives reasonable consumers the impression that they will be charged only *after* the original subscription ends. Meanwhile, a separate Nord Security "terms" document reveals, in a paragraph not cross referenced in the "Auto-Renewal" paragraph above, that customers on plans lasting greater than a month will be charged in advance: "at least 14 days before" the scheduled auto-renewal. This provision is itself in conflict with another "provision in the same "terms" document, which provides that "*[a]fter the end* of your initial plan, your subscription *will be automatically renewed*, and you will *be charged*[.]" (emphasis added). In other words, this paragraph in the "terms" document expressly states that the consumer will *not* be charged until "after" the subscription period ends, not "at least fourteen days" before.

64.    The information obscured and omitted by Nord Security's subscription scheme is material to and relied on by reasonable consumers because such information goes to the very core of any transaction with NordVPN—how much (or how often) consumers will pay, and how and when the transaction ends. Nord Security's misrepresentations and omissions of material facts concerning the automatic renewal offer terms are knowing, in bad faith, and made with the intent to mislead customers about the true nature of a Nord Subscription.

26

65.     After Plaintiff enrolled in Nord Security, Nord Security sent Plaintiff an email with the subject line "Welcome to NordVPN!" A representative version of the acknowledgement email sent to Plaintiff and other consumers is shown on the following page:

27



66.     After Plaintiff enrolled in Nord Security, Nord Security also sent Plaintiff a second email containing the word "receipt" in the subject line. The receipt email sent to Plaintiff is reproduced below:



67.     Neither Defendant's post-enrollment acknowledgement nor receipt emails meet the post-purchase requirements that the Virginia and North Carolina ARLs impose on an automatically renewing product or service. They do not clearly and conspicuously disclose how to cancel a Nord Subscription. NC ARL § 75-41(a)(2). Nor do they provide that the Nord Subscription will continue until the consumer cancels, describe or contain the cancellation policy, disclose the recurring charges that will be charged to consumers' payment methods, disclose the length of the automatic renewal term, or include "information regarding how to cancel in a manner that is capable of being

retained by the consumer." VA ARL §§ 59.1–207.45.1–4, 59.1-207.46.A.3. In fact, neither of these emails include any disclosure whatsoever about how to cancel a Nord Security Subscription.

68. Moreover, neither Defendants' acknowledgement nor receipt emails contain a toll-free telephone number, an electronic email address, or another cost-effective, timely, and easy-to-use mechanism for cancellation. *Id.* § 59.1-207.46.B.

69. Like with the enrollment process, the information omitted in Defendants' acknowledgement and receipt emails is material to and relied on by reasonable consumers. Defendants' conduct was a tall times knowing, in bad faith, and made with the intent to mislead customers about the true nature of a Nord Subscription.

70. Due to Nord Security's violations of the VA ARL, the Nord Security Subscriptions constitute an "unconditional gift to the consumer." *Id.* § 59.1-207.47.

71. Due to Nord Security's violations of the NC ARL, the automatic renewal clause is "void and unenforceable." NC ARL § 75-41(e).

**C.     Nord Security's Unlawful, Unfair, and Deceptive Cancellation Process.**

72. Nord Security's cancellation process is not simple, cost-effective, timely, easy-to-use, nor readily accessible to consumers. Instead, Nord Security employs the "roach motel" strategy: it is easy to sign up for Nord Security products and services, but hard to get out.

73. Nord Security buries its cancellation mechanism four layers deep in its customer account portal, with no clear path evident to the consumer for how to get there. Canceling a Nord Security subscription first requires consumers to (1) log into their customer account, and (2) select "Billing" from a list of at least nine options. Once "Billing" is selected, the default view on the "Billing" page does not mention anything about cancellation, and instead shows the consumer's "Billing history." Upon information and belief, Nord Security's "Home" and "Billing" pages

available to Plaintiff after October 2021 were materially similar to Nord Security's current Home

and Billing pages copied below and on the next page:





74.      After navigating to Nord Security's "Billing page," consumers wishing to cancel

must then (3) figure out how to navigate to the "Subscriptions" tab on the "Billing" page. Once

customers access the "Subscriptions" tab, they are still not presented with a "Cancel" option.

Instead, consumers must then (4) understand that they need to click on "Manage" on a line

pertaining to "Auto-renewal" to finally access a page where they can cancel their account. Upon

information and belief, Nord Security's "Subscriptions" tab available to Plaintiff after October

2021 was materially similar to the Nord Security "Subscriptions" tab as copied below, as well as

the page consumers view when they click "Manage" next to "Auto-renewal," in the image on the next page:





75.     For consumers who manage to find and click "Cancel auto-renewal," the autorenewal is finally canceled. But Nord Security's multi-step cancellation process is specifically and intentionally designed to thwart cancellation—a "roach motel" dark pattern that prevents consumers from finding and canceling autorenewal. This is an unlawful, unfair, and deceptive trade practice that violates the Virginia ARL and North Carolina's consumer protection statutes.

*See* N.C.G.S. § 75-1.1(a); VA ARL § 59.1-207.46.B. Nor does Nord Security offer a conspicuous online option to cancel a recurring Nord Subscription. VA ARL § 59.1-207.46.B.

76.     For those consumers who use Nord Security's mobile application, like Plaintiff, there is no way in which to cancel autorenewal. This too violates the VA ARL. *Id.*

77.     Nord Security's cancellation process is material to consumers because once they have been trapped in a renewing Nord Subscription, the only way to halt payments is to cancel it. Nord Security's cancellation process is intentionally designed to prevent cancelation and keep consumers paying for unlawful Nord Subscriptions.

> **D.     Nord Security's Insufficient Autorenewal "Notice" Violates the Virginia and North Carolina ARLs**

78.     Nord Security offers subscriptions with an initial plan term of one year or longer that later automatically renew. For customers with such subscriptions, under the VA ARL Nord Security must provide notice of the upcoming automatic renewal "no less than 30 days and no more than 60 days before the cancellation deadline or the end of the current contract term." *Id.* § 59.1-207.46.E. The notice must conspicuously disclose "(i) that the automatic renewal or continuous service offer will automatically renew unless the consumer cancels, (ii) the date by which the consumer must cancel to avoid automatic renewal or continuous service, (iii) the method by which the consumer may cancel, and (iv) a copy of the automatic renewal or continuous service offer provisions." *Id.*

79.     The NC ARL similarly requires "at least 15 days but no earlier than 45 days before the date the contract is to be automatically renewed, stating the date on which the contract is scheduled to automatically renew and notifying the consumer that the contract will automatically renew unless it is cancelled by the consumer prior to that date." NC ARL § 75-41(a)(3).

80.    On November 25, 2023, approximately one month before Nord Security charged Plaintiff for an unwanted and unauthorized automatic renewal, Nord Security sent Plaintiff an email with the subject line "Subscription renewal in 30 days."  The content of the email sent to Plaintiff is shown below:



81.    Nord Security's email misleads the customer as to the date by which the customer must cancel to avoid being charged for an automatic renewal.  The email lists the date on which the current subscription period expires (here "January 8th"), but carefully and intentionally omits the fact that the customer must cancel at least 14 days prior to January 8th to avoid being charged again.

82.    Nord Security's email is intended to mislead consumers into thinking that they can avoid an autorenewal charge if they cancel by the subscription expiration date.

83.     Nord Security's email does not conspicuously disclose that the Nord Subscription will automatically renew unless the consumer cancels, the date by which the consumer must cancel to avoid automatic renewal, VA ARL § 59.1-207.46.E; NC ARL § 75-41(a)(3), or a copy of the automatic renewal offer provisions, VA ARL § 59.1-207.46.E. The email simply states with no emphasis that the user must "cancel" to avoid a charge.

84.     On November 25, 2024, approximately one month before Nord Security charged Plaintiff for another unwanted and unauthorized automatic renewal, Nord Security sent Plaintiff a substantially similar email with the same deficiencies identified above.

85.     On November 25, 2025, approximately one month before Nord Security charged Plaintiff for yet another unwanted and unauthorized automatic renewal, Nord Security sent Plaintiff an email with the subject line "Subscription renewal: Payment in 30 days."  The content of the email sent to Plaintiff is shown below:

35



86.     Nord Security's updated notice email still does not ***conspicuously*** disclose that the automatic renewal will automatically renew unless the consumer cancels, the date by which the consumer must cancel to avoid automatic renewal, VA ARL § 59.1-207.46.E; NC ARL § 75-41(a)(3), or a copy of the automatic renewal offer provisions, VA ARL § 59.1-207.46.E.

**E.**   **Nord Security Violates the Virgina ARL's Requirements with Respect to Material Changes to Consumers' Automatic Renewal Terms**

87.   In at least July 2022 and February 2026, Nord Security made additional material changes to the automatic renewal terms applicable to Plaintiff and other Virginia consumers whose accounts were set to automatically renew.

88.   First, on June 22, 2022, Nord Security sent Virginia consumers an email regarding updates to Nord Security's "Terms of Service" effective July 1, 2022. In relevant part, the email stated that the Company made the following changes:

- **"New and clearer rules for subscriptions and auto-renewals.** We've revised and reorganized some of the terms regarding subscriptions and auto-renewals. We now emphasize in more detail that our paid services are provided on a subscription basis and will be renewed automatically unless you cancel the subscription before the upcoming charge."

- **"Clarified rules for cancelation and refunds.** We've provided more details on cancelation and refund policies."

89.   An excerpt of the June 22, 2022 email sent to Plaintiff that contains material changes to the terms of Nord Security customers' automatic renewal terms is reproduced on the following page:

37

Dear customer,

We're updating our Terms of Service and Privacy Policy. These changes will take effect on July 1, 2022, and won't have any technical impact on the use of Nord's services. We're letting you know ahead of time what's changing.

**Summary of the changes to the Terms of Service:**

- **Improved readability.** The updated documents are easier to read, have a clearer language, and provide more examples. We've added definitions to help you better understand key aspects and legal concepts we're using.
- **New and clearer rules for subscriptions and auto-renewals.** We've revised and reorganized some of the terms regarding subscriptions and auto-renewals. We now emphasize in more detail that our paid services are provided on a subscription basis and will be renewed automatically unless you cancel the subscription before the upcoming charge.
- **Clarified rules for cancelation and refunds.** We've provided more details on cancelation and refund policies.
- **New and clearer rules for prohibited and restricted use.** Our Terms of Service now better define how our services work and what rights and obligations users have. We want to help you understand

90. The June 22, 2022 email fails to comply with the VA ARL's material change provision because it does not provide clear and conspicuous notice of the changes that would be made to consumers' existing autorenewal terms on July 1, 2022. VA ARL § 59.1-207.46(C). Instead, the email offers only vague statements that changes will be made and makes no distinction as to the format for the material changes to customers' automatic renewal terms and all other changes to Nord Security's "Terms of Service" more broadly (bullet point with bolded clause followed by unbolded sentence(s)).

91. The June 22, 2022 email also fails to comply with the VA ARL's material change provision because it does not "provide information regarding how to cancel in a manner that is

38

capable of being retained by the consumer." Indeed, the email provides *no* information whatsoever on how to cancel.

92.     The changes Nord Security made to its automatic renewal terms on July 1, 2022 were material. For example, the June 15, 2022 email states that the Terms of Service will be changed to provide "more details on cancelation and refund polices." The cancellation policy is one of the automatic renewal offer terms that must be disclosed to consumers under the VA ARL, *id.* § 59.1-207.46.A.3, and thus notice of any material changes to that policy must be made in a manner that complies with VA ARL § 59.1-207.46.C, which Nord Security's June 22, 2022 email fails to do.

93.     Second, on January 21, 2026, Nord Security sent Virginia consumers an email regarding updates to Nord Security's "Terms of Service" and "Subscription Terms" effective February 16, 2026. In relevant part, the email stated that the Company made the following changes:

- **"Clearer Subscription Terms.** We introduced more definitions and clarifications for key concepts related to service subscriptions and the auto-renewal process, making them even more readable."

- **"More detailed rules for cancellation and refunds.** We described your cancellation options and eligibility for refunds across different purchase channels in more detail."

94.     The January 21, 2026 email also included a link to Nord Security's updated Terms of Service and Subscription Terms.

95.     An excerpt of the January 21, 2026 email sent to Plaintiff that contains material changes to the terms of Nord Security customers' automatic renewal terms is reproduced on the following page:



**Dear customer,**

**We've revised our Terms of Service and Privacy Policy** to make them easier to understand. Don't worry — these changes will have no technical impact on your use of Nord's services. The changes will take effect on **February 16, 2026.**

*What's changing?*

**Terms of Service:**

- **Improved readability.** We simplified the Terms of Service and added more comprehensive structure and explanations to make them easier to navigate and understand.
- **Clearer Subscription Terms.** We introduced more definitions and clarifications for key concepts related to service subscriptions and the auto-renewal process, making them even more readable.
- **More detailed rules for cancellation and refunds.** We described your cancellation options and eligibility for refunds across different purchase channels in more detail.

Read the updated Terms of Service here.
Read the updated Subscription Terms here.

96.      The January 21, 2026 email fails to comply with the VA ARL's material change provision because it does not provide clear and conspicuous notice of the changes that would be made to consumers' existing autorenewal terms on July 1, 2022. VA ARL § 59.1-207.46(C). Instead, the email offers only vague statements that changes will be made and makes no distinction as to the format for the material changes to customers' automatic renewal terms and all other changes to Nord Security's "Terms of Service" and "Subscription Terms" more broadly (bullet point with bolded clause followed by unbolded sentence(s)).

97.      The January 21, 2026 email also fails to comply with the VA ARL's material change provision because it does not "provide information regarding how to cancel in a manner

that is capable of being retained by the consumer." Indeed, the email provides *no* information whatsoever on how to cancel.

98.    The changes Nord Security made to its automatic renewal terms on February 16, 2026. For example, the January 21, 2026 email states that the Terms of Service and Subscription Terms will be changed to provide "more definitions and clarifications for key concepts related to service subscriptions and the auto-renewal process," and to provide "[m]pre detail" on "your cancellation options." These are all automatic renewal offer terms that must be disclosed to consumers under the VA ARL, *id.* § 59.1-207.46.A, and thus notice of any material changes to that policy must be made in a manner that complies with VA ARL § 59.1-207.46.C, which Nord Security's January 21, 2026 email fails to do.

**F.    How Nord Security's Subscription Practices Injured Plaintiff**

99.    Plaintiff was injured by Nord Security's unlawful, unfair, and deceptive subscription scheme because subscription scheme because had Plaintiff known that he was enrolling in an automatically renewing subscription, he would not have enrolled in a Nord Security subscription.

100.    On approximately October 8, 2021, while stationed in Virginia, Plaintiff enrolled in a two-year subscription to Nord Security's NordVPN service. The two-year period began on January 8, 2022, following a three-month free period included in his enrollment. Plaintiff's subscription term was thus October 8, 2022 to January 8, 2024.

101.    On October 8, 2021, Plaintiff received a receipt from Nord Security for $89.00 for the NordVPN service.

102.    After signing up for Nord Security's VPN service, Plaintiff downloaded the NordVPN mobile application.

103. Plaintiff decided he did not want to continue with Nord Security after his two-year plan ended.

104. Having decided not to continue with Nord Security, Plaintiff believed that once his plan period was over, he would no longer be a Nord Security customer. Indeed, Plaintiff never expected to pay Nord Security anything beyond what he had already paid in October 2021 because Nord Security did not adequately disclose to Plaintiff that it would begin charging non-refundable recurring fees on a yearly basis after his two-year plan concluded.

105. Nonetheless, on or about December 25, 2023 (while Plaintiff was stationed in North Carolina), Nord Security charged Plaintiff's credit card $99.48 without his knowledge or permission for a one-year NordVPN subscription set to begin on or about January 8, 2024.

106. On or about December 25, 2024 (while Plaintiff was stationed in North Carolina), Nord Security charged Plaintiff's credit card $149.88 without his knowledge or permission for a one-year NordVPN subscription set to begin on or about January 8, 2025.

107. On or about December 25, 2025 (while Plaintiff was again stationed in Virginia), Nord Security charged Plaintiff's credit card $149.88 without his knowledge or permission for yet another one-year NordVPN subscription set to begin on or about January 8, 2026.

108. At some point after Nord Security made the third unauthorized charge to Plaintiff's credit card in December 2025, Plaintiff discovered that Nord Security was repeatedly charging his credit card without his knowledge or permission.

109. Thereafter, Plaintiff attempted to cancel his Nord Security subscription via the NordVPN mobile app but was unable to do so. He then searched for information on the internet about how to cancel the unauthorized subscription but was nonetheless unable to figure out how to cancel.

110.    Plaintiff was finally able to cancel autorenewal of his Nord Security subscription on February 27, 2026 with the assistance of his counsel.

111.    Nord Security did not "clearly and conspicuously" disclose to Plaintiff that it would automatically renew his Nord Security subscription for a one-year term at $99 after his initial two-year plan expired, nor that it would continue renewing his subscription each year thereafter. This information is not clearly and conspicuously provided in the contract offers made on Nord Security's website, in any hyperlinked terms on the website, or in any post-purchase acknowledgement or receipt email.

112.    Similarly, Nord Security did not "clearly and conspicuously" disclose to Plaintiff how he could cancel his Nord Security subscription. This information is not clearly and conspicuously provided in the contract offers made on Nord Security's website, in any hyperlinked terms on the website, or in any post-purchase acknowledgement or receipt email. Nor did Nord Security offer Plaintiff a conspicuous online option to cancel a recurring Nord Subscription.

113.    Nord Security failed to provide Plaintiff with the legally required notice of upcoming automatic renewal of his Nord Security subscription. Nord Security's supposed "notice" email misled Plaintiff regarding the date and time he would be billed for an automatic renewal, does not include one or more methods by which Plaintiff could cancel the automatic renewal, does not include a link or other reasonably accessible electronic means for cancellation, does not provide contact information, and does not provide a copy of the automatic renewal offer provisions.

114.    Nord Security also failed to clearly and conspicuously provide required notices of material changes made to its automatic renewal terms and did not disclose how to cancel Plaintiff's Nord Security subscription in its emails in June 2022 and January 2026, as well as the emails sent

43

to Plaintiff that included material changes to the terms of Plaintiff's initial Nord Security subscription in the price and length for autorenewals made in 2022 and 2026.

115.    Plaintiff did not authorize or want his Nord Security subscription to renew once, let alone three times.

116.    In addition, Nord Security's violations of the VA ARL rendered Plaintiff's initial subscription purchase in 2021 an "unconditional gift." VA ARL § § 59.1-207.47.

117.    Plaintiff was injured when Nord Security charged his credit card $89.00 once, $99.48 once and $149.88 twice, for a total of $488.24, for a Nord Subscription that violated the VA ARL and for renewals that Plaintiff did not want and did not want to pay for.

118.    Plaintiff was further injured by Nord Security's subscription practices because had he known the truth about Nord Security's intentionally misleading subscription period and subscription practices, he would not have enrolled in a Nord Subscription.

119.    Plaintiff intends to purchase products and services in the future for himself from internet security companies, including Nord Security, as long as he can gain some confidence in Nord Security's representations about its products and services and subscription practices, including autorenewal and cancellation. Moreover, Nord Security still has Plaintiff's payment information and could use it to process unauthorized payments in the future.

120.    Given that Nord Security has engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of Nord Security's last wrongful act against Plaintiff, which was in December of 2025, when Nord Security last charged Plaintiff for an automatically renewing subscription he did not want and did not want to pay for.

121.    Given that Nord Security's subscription scheme is premised on misrepresentation and deception, Plaintiff's claims did not accrue until January 2026, when Plaintiff discovered Nord Security's deception.

## RULE 9(B) ALLEGATIONS

122.    To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

123.    WHAT

- Nord Security conducts its unlawful, unfair, and deceptive subscription scheme by failing to clearly and conspicuously disclose the Company's automatic renewal terms and conditions to customers, including how to cancel a subscription. For example, instead of clearly explaining to the consumer the material terms of what they are actually getting into, Nord Security misleads customers by requiring them to scroll to find the relevant (and inadequate) fine print on its payment page and buries the key provisions in confusing, inconsistent, and inaccurate terms scattered across multiple sections of at least two fine print documents.

- Nord Security conducts its unlawful, unfair, and deceptive subscription scheme by subjecting Nord Security customers to an exceedingly difficult cancellation process that requires consumers to figure out—with no help from the Company— the entirely unorthodox process of navigating Nord Security's account settings to find a buried feature labelled "Auto-renewal" and turning it to "OFF" (rather than, for example, by clicking a button clearly and prominently labelled, "CANCEL SUBSCRIPTION"). Nord Security's cancellation process is intentionally difficult to navigate and complete in order to trap consumers into paying for recurring Nord Security subscriptions that they do not want. Nor does Nord Security offer a conspicuous online option to cancel a recurring Nord Subscription.

- Nord Security conducts its unlawful, unfair, and deceptive subscription scheme by failing to meet the post purchase requirements that the ARL imposes on an automatically renewing product or service. Nord Security does not provide a clear and conspicuous disclosure of material terms such as how to cancel a Nord Subscription, NC ARL § 75-41(a)(2), or including the cancellation policy, VA ARL § 59.1-207.46.A.3. In fact, neither Nord Security's acknowledgment nor receipt emails include any disclosure whatsoever about how to cancel a Nord Security subscription. *See* NC ARL § 75-41(a)(2); VA ARL § 59.1-207.46.3. Nor do these emails disclose

45

material terms that Nord Subscriptions will continue until the consumer cancels, disclose the recurring charges that will be charged to consumers, or the length of the automatic renewal term. VA ARL § 59.1-207.46.3.

- Nord Security conducts its unlawful, unfair, and deceptive subscription scheme by failing to meet the requirements to notify customers about forthcoming automatic subscription renewals, including by failing to clearly and conspicuously: (1) state that the Nord Subscription will automatically renew unless canceled; (2) state the date by which the consumer must cancel to avoid automatic renewal; and (3) provide a copy of the automatic renewal offer provisions. Nord Security also actively misleads consumers in supposed "notice" emails that provide the subscription end date without making clear that to avoid a future charge the customer must cancel at least 14 days before that date.

- Nord Security conducts its deceptive and unlawful subscription scheme by failing to provide clear and conspicuous notice of material changes to customers' existing autorenewal terms and failing to provide information regarding how to cancel in a manner that is capable of being retained by consumers in connection with those material changes.

124.    WHERE: Nord Security's deceptive and unlawful subscription scheme is conducted through its website, mobile/tablet/desktop applications, and electronic communications with customers.

125.    WHEN: Nord Security has been engaging in its deceptive and unlawful subscription scheme for years, and the scheme is ongoing. For specific examples, Nord Security used its deceptive and unlawful subscription practices scheme when Plaintiff first enrolled in a Nord Security subscription on approximately October 8, 2021, through Nord Security's acknowledgment and receipt emails sent to Plaintiff, Nord Security's "terms of service" and "terms" hyperlinks, Nord Security's June 22, 2022 and January 21, 2026 material change emails, and Plaintiff's unsuccessful attempt to cancel his account after learning that Nord Security had charged him for a third unwanted automatic renewal sometime after December 2025. Nord Security uses the same or substantially similar deceptive and unlawful subscription practices scheme for all of its customers.

126. WHY: Nord Security uses its deceptive and unlawful subscription scheme to trap Nord Security customers into paying for Nord Security subscriptions that they do not want. As a direct result of this scheme, Defendants have successfully reaped tens of millions in unlawful charges at the expense of unsuspecting customers.

127. HOW: Nord Security conducts its deceptive and unlawful practices scheme by making the material misrepresentations and omissions in violation of North Carolina and Virginia consumer protection law and the common law alleged in detail above. Nord Security's misrepresentations are intentional, made with the intent to mislead consumers, and reasonable consumers rely on Nord Security's statements.

## CLASS ACTION ALLEGATIONS

128. Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class that is preliminarily defined as all Nord Security customers in Virginia (including customers of companies Nord Security acts as a successor to) who were automatically enrolled into and charged for at least one month of Nord Security membership by Defendants at any time from the applicable statute of limitations period to the date of judgment (the "Virginia Class").

129. Plaintiff also brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class that is preliminarily defined as all Nord Security customers in the state of North Carolina (including customers of companies Nord Security acts as a successor to) from the earliest allowable date through the date of judgment (the "North Carolina Class") (together with the Virginia Class, the "Classes").

130. As alleged throughout this Complaint, the Class's claims all derive directly from a single course of conduct by Defendants. Defendants have engaged in uniform and standardized

47

conduct toward the Classes and this case is about the responsibility of Defendants, at law and in equity, for their knowledge and conduct in deceiving their customers. Defendants' conduct did not meaningfully differ among individual Class Members in their degree of care or candor, their actions or inactions, or in their false and misleading statements or omissions. The objective facts on these subjects are the same for all Class Members.

131.    Excluded from the Classes are: Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants. Also excluded are federal, state and local government entities; and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

132.    Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Classes and/or add Subclasses, when Plaintiff files his motion for class certification.

133.    Plaintiff does not know the exact size of the Classes since such information is in the exclusive control of Defendants. Plaintiff believes, however, that the Classes encompass thousands of consumers whose identities can be readily ascertained from Nord Security's records. Accordingly, the members of the Classes are so numerous that joinder of all such persons is impracticable.

134.    The Classes are ascertainable because their members can be readily identified using data and information kept by Defendants in the usual course of business and within their control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

135. Plaintiff is an adequate class representative. Plaintiff's claims are typical of the claims of the Classes and do not conflict with the interests of any other members of the Classes. Plaintiff and the other members of the Classes were subject to the same or similar conduct engineered by Defendants. Further, Plaintiff and members of the Classes sustained substantially the same injuries and damages arising out of Defendants' conduct.

136. Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Classes.

137. Questions of law and fact are common to the Classes and predominate over any questions affecting only individual Class members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

   a. Whether Defendants' conduct violates the NC ARL;

   b. Whether Defendants' conduct violates the applicable North Carolina consumer protection statutes;

   c. Whether Defendants' conduct violates the VA ARL;

   d. Whether Defendant's conduct violates the applicable Virginia consumer protection statutes;

   e. Whether Defendants' conduct violates the applicable common law doctrines;

   f. Whether Defendants were unjustly enriched as a result of their conduct;

   g. Whether Class Members have been injured by Defendants' conduct;

   h. Whether, and to what extent, equitable relief should be imposed on Defendants to prevent them from continuing their unlawful practices; and

   i. The extent of class-wide injury and the measure of damages for those injuries.

138. A class action is superior to all other available methods for resolving this controversy because (1) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; (2) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct; (3) Defendants have acted or refused to act on grounds generally applicable to all Class Members; and (4) questions of law and fact common to the Classes predominate over any questions affecting only individual Class Members.

139. Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

   a. Whether Defendants' conduct violates the NC ARL;

   b. Whether Defendants' conduct violates the applicable North Carolina consumer protection statutes;

   c. Whether Defendants' conduct violates the VA ARL;

   d. Whether Defendant's conduct violates the applicable Virginia consumer protection statutes;

   e. Whether Defendants' conduct violates the applicable common law doctrines;

   f. Whether Defendants were unjustly enriched as a result of their conduct;

   g. Whether Class Members have been injured by Defendants' conduct; and

   h. Whether, and to what extent, equitable relief should be imposed on Defendants to prevent them from continuing their unlawful practices.

140. Accordingly, this action satisfies the requirements set forth under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

## COUNT I

### VIRGINIA CONSUMER PROTECTION ACT
(Va. Code Ann. § 59.1–196 , *et seq.*)
(ON BEHALF OF PLAINTIFF AND THE VIRGINIA CLASS)

141.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

142.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Virginia Class.

143.    The Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196, *et seq.* ("VCPA), is intended to be "remedial legislation to promote fair and ethical standards of dealings between suppliers and the consuming public." Va. Code Ann § 59.1-197.

144.    Under the VCPA, Defendants are "suppliers" and the conduct described herein is a "consumer transaction." *Id.* § 59.1-198.

145.    The Nord Subscriptions at issue are "goods" under the VCPA. *Id.*

146.    Defendants' acts and omissions detailed above violated the VCPA, including but not limited to:

a.    Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits, *id.* § 59.1-200.5;

b.    Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised, *id.* § 59.1-200.8;

c.    Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction, *id.* § 59.1-200.14;

d.    Violating Va. Code Ann. § 18.2-178, *id.* § 59.1-200.57;

e.    Violating the VA ARL, *id.* § 59.1-200.58; and

f.    Failing to make available a conspicuous online option to cancel a recurring purchase of a good or service, *id.* § 59.1-200.68.

147.   The VA ARL requires companies like Nord Security to:

a.   Before the initial order is complete, clearly and conspicuously present the automatic renewal offer terms—(1) that the subscription will continue until the consumer cancels; (2) the description of the cancellation policy that applies; (3) the amount of the recurring charges and that the amount will change; (4) the length of the term; and (5) any minimum purchase obligation, Va. Code Ann. § 59.1-207.45— "in a clear and conspicuous manner, *id.* § 59.1-207.45.A.1;

b.   Charge consumers without obtaining affirmative consent to any agreement containing the automatic renewal offer terms, *id.* § 59.1-207.45.A.2;

c.   Provide an acknowledgment of purchase that contains the automatic renewal offer terms, cancellation policy, and "information regarding how to cancel in a manner that is capable of being retained by the consumer," *id.* § 59.1-207.45.A.3;

d.   Provide a "cost-effective, timely, and easy-to-use mechanism for cancellation," such as a toll-free telephone number or electronic mail address, *id.* § 59.1-207.45.B;

e.   Provide a "conspicuous online option to cancel a recurring purchase of a good or service," *id.*;

f.   Provide clear and conspicuous notice of any material change in the terms of the automatic renewal offer before implementing the material change, *id.* § 59.1-207.45.C;

g.   In connection with any material change, provide "information regarding how to cancel in a manner that is capable of being retained by the consumer," *id.*; and

h.   No more than 30 days and no less than 60 days before a subscription automatically renews, clearly and conspicuously disclose that: (1) the subscription renews unless the consumer cancels; (2) the date by which the consumer must cancel to avoid being charged; (3) the method by which the consumer may cancel; and (4) a copy of the automatic renewal offer provisions, *id.* § 59.1-207.45.E.

148.   Under the VA ARL, "'[c]lear and conspicuous' or 'clearly and conspicuously' means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." *Id.* § 59.1–207.45.

149. As alleged herein, Defendants failed to comply with the VA ARL.

150. As a result of Defendants' violations of the VA ARL, Nord Security's "goods, wares, merchandise, or products shall for all purposes be deemed an unconditional gift[.]" *Id.* § 59.1-207.47.

151. "Any violation" of the VA ARL is a prohibited practice under Va. Code Ann. § 59.1-200. Va. Code Ann. § 59.1-207.49; *see also* Va. Code Ann. § 59.1-200.A.58 (declaring "unlawful" any violation of the VA ARL).

152. Defendants did not make a good faith effort to comply with the VA ARL.

153. Defendants intended that Plaintiff and Virginia Class Members, in making their decisions to purchase a Nord Subscription, would reasonably rely on Nord Security's misrepresentations and omissions regarding the automatic renewal and cancellation features of Nord Subscriptions. By failing to disclose the truth about such features, Nord Security misrepresented and concealed material facts from Plaintiff and Virginia Class Members.

154. Defendants' violations of the VCPA were willful.

155. In the alternative, Defendants' violations of the VCPA were non-willful but deprived the consuming public, including Plaintiff and Virginia Class Members, of fair and ethical consumer transactions.

156. Plaintiff and the Virginia Class suffered monetary damages as a result of Defendants' conduct.

157. Defendants are liable to Plaintiff and Virginia Class Members for attorneys' fees and costs. Va. Code Ann. § 59.1-204.B. Because Defendants' violations of the VCPA were willful, Defendants are liable to Plaintiff and the Virginia Class Members for treble damages or $1,000 per violation, whichever is greater. *Id.* § 59.1-204.A. If Defendants' conduct is found to not be

willful, Defendants are liable to Plaintiff and the Virginia Class Members for actual damages sustained or $500, whichever is greater. *Id.* In the alternative, Plaintiff and Virginia Class Members are entitled to restitution and attorneys' fees and costs. *Id.* § 59.1-207.

**COUNT II**

**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND THE VIRGINIA CLASS)**

158.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

159.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Classes.

160.    Under Virginia law, a claim for unjust enrichment requires showing that the plaintiff conferred a benefit on the defendant, the defendant knew of the benefit and should reasonably have expected to repay the plaintiff, and defendant accepted or retained the benefit without paying for its value. *T. Musgrove Constr. Co., Inc. v. Young*, 298 Va. 480, 486 (2020).

161.    By the unauthorized automatic renewal payments from Plaintiff and the Virginia Class, Plaintiff and the Virginia Class conferred a benefit on Defendants. Defendants knew of the benefit reasonably should have expected to repay these unauthorized amounts. Defendants accepted and retained these benefits without paying for their value.

162.    As a result of their unjust conduct, Defendants has been unjustly enriched.

163.    As a result of Defendants' violations of the VA ARL, Nord Security's "goods, wares, merchandise, or products shall for all purposes be deemed an unconditional gift[,]" VA ARL § 59.1-207.47, thus giving rise to a claim for unjust enrichment or restitution.

164.    By reason of Defendants' wrongful conduct, Defendants has benefited from receipt and maintenance of improper funds, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

165. As a result of Defendants' conduct it would be unjust and/or inequitable for Defendants to retain the benefits of its conduct without restitution to Plaintiff and the Classes. Accordingly, Defendants must account to Plaintiff and the Classes for their unjust enrichment.

## COUNT III

**NORTH CAROLINA AUTOMATIC RENEWAL LAW (N.C.G.S. § 75-41, *et seq*.)**
**(ON BEHALF OF PLAINTIFF AND THE NORTH CAROLINA CLASS)**

166. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

167. Plaintiff brings this claim on his own behalf and on behalf of each member of the North Carolina Class.

168. The NC ARL requires any person offering a contract that "automatically renews unless the consumer cancels the contract" to: (1) "[d]isclose the automatic renewal clause clearly and conspicuously in the contract or contract offer;" (2) "[d]isclose clearly and conspicuously how to cancel the contract in the initial contract, contract offer, or with delivery of products or services;" and (3) for any automatic renewal exceeding 60 days, provide written notice of the renewal between 15 and 45 days before renewal, with the notice including the date of renewal and that the contract will automatically renew unless it is cancelled before that date. N.C.G.S. §§ 75-41(a)(1)–(3).

169. As alleged herein, Defendants failed to comply with the NC ARL's requirements.

170. Defendants' violations of the NC ARL "render[] the automatic renewal clause void and unenforceable." N.C.G.S. § 75-41(e).

171. Defendants are not afforded any of the protections of N.C.G.S. §75-41(c) because, upon information and belief, Defendants cannot demonstrate that they use of the following routine business practices: (1) establishing and implementing written procedures to comply with N.C.G.S. §75-41 and enforcing compliance with those procedures; (2) any failure to comply with N.C.G.S.

§ 75-41 is the result of error; and (3) where an error has caused the failure to comply with N.C.G.S. § 75-41, Defendants provide full refunds or credit for all amounts billed or paid by Plaintiff and North Carolina Class Members from the date of the renewal until the date of the termination of the contract, or the date of the subsequent notice of renewal, whichever occurs first.

172.    Plaintiff and the North Carolina Class suffered monetary damages as a result of Defendants' conduct.

173.    Defendants are liable to Plaintiff and North Carolina Class Members for actual damages sustained.

## COUNT IV

### NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (N.C.G.S. § 75-1.1, *et seq.*)
### (ON BEHALF OF PLAINTIFF AND THE NORTH CAROLINA CLASS)

174.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

175.    Plaintiff brings this claim on his own behalf and on behalf of each member of the North Carolina Class.

176.    North Carolina's Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1, *et seq.* ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C.G.S. § 75-16.

177.    Defendants engaged in unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, with respect to the sale and advertisement of the products and services purchased by Plaintiff and North Carolina Class Members, in violation of N.C.G.S. § 75-1.1(a), including by making false representations and/or

56

concealing the true risks of a Nord Subscription, and by failing to engage in fair and upright business practices.

178. The above unfair or deceptive acts or practices by Defendants were conducted in or affecting "commerce," as defined by N.C.G.S. § 75-1.1(b).

179. The above unfair or deceptive acts or practices by Defendants were reasonably and intentionally calculated to deceive class members and other consumers.

180. The above unfair or deceptive acts or practices by Defendants did in fact deceive class members and other consumers, causing them damage.

181. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous.

182. Defendants' actions were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Class Members.

183. Plaintiff and the North Carolina Class Members relied on Defendants' representations in that they would not have purchased, chosen, and/or paid for all or part of Nord Security's products and services had they known the truth about the risks of subscribing to Nord Security.

184. Nord Security knew or should have known that the above unfair and deceptive practices and acts were material omissions, misrepresentations, or were otherwise deceptive or unfair.

185. The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of North Carolina, which aims to protect consumers.

186.    As a direct and proximate result of Nord Security's unlawful deceptive acts and practices, Plaintiff and North Carolina Class Members suffered and continue to suffer an ascertainable loss of money or property, real or personal, as described above.

187.    Plaintiff and North Carolina Class Members seek relief under N.C.G.S. §§ 75-16 and 75-16.1, including, but not limited to injunctive relief, damages, treble damages, and attorneys' fees and costs.

**COUNT V**

**CIVIL LIABILITY FOR OBTAINING PROPERTY BY FALSE PRETENSES
(ON BEHALF OF PLAINTIFF AND THE NORTH CAROLINA CLASS)**

188.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

189.    Plaintiff brings this claim on his own behalf and on behalf of each member of the North Carolina Class.

190.    N.C.G.S. § 1-538.2 provides civil liability for various criminal offenses, including obtaining property by false pretense under N.C.G.S. § 14-100. N.C.G.S. § 1-538.2(a).

191.    N.C.G.S. § 1-538.2 further provides that "[a]n action may be brought under this section regardless of whether a criminal action is brought, or a criminal conviction is obtained for the act alleged in the civil action." N.C.G.S. § 1-538.2(c).

192.    "[T]he owner of the property is entitled to recover any consequential damages, and punitive damages, together with reasonable attorneys' fees. The total compensatory and consequential damages awarded to a plaintiff against a defendant under this section shall not be less than one hundred fifty dollars ($150.00) and shall not exceed one thousand dollars ($1,000)." N.C.G.S. § 1-538.2(a).

193.    Under North Carolina law, "[t]he essential elements for obtaining property by false pretenses consists of the following: '(1) a false representation of a subsisting fact or a future

fulfillment or event, (2) which is calculated and intended to deceive, (3) which does in fact deceive, and (4) by which one person obtains or attempts to obtain value from another.'" *Seelig v. Solomon*, No. 5:16-HC-2030-FL, 2017 WL 829336, at \*5 (E.D.N.C. Mar. 2, 2017) (*quoting State v. Cronin*, 262 S.E.2d 277, 286 (N.C. 1980)).

194.    Defendant made false representations with respect to the sale and advertisement of the products and services purchased by Plaintiff and North Carolina Class Members, including false representations or concealment of the true risks of a Nord Subscription.

195.    The above false representations by Defendants were reasonably and intentionally calculated to deceive Plaintiff, North Carolina Class Members, and other consumers.

196.    The above false representations by Defendants did in fact deceive Plaintiff, North Carolina Class Members, and other consumers, causing them damage.

197.    As a direct and proximate result of Defendants' false representations, Plaintiff and the North Carolina Class members suffered an ascertainable loss of money or property, as described above. Defendants attempted to obtain and/or obtained Plaintiff's and North Carolina Class Members' loss as monetary value.

198.    Plaintiff and North Carolina Class Members seek relief under N.C.G.S. §§ 1-538.2 and 14-100, including, but not limited to consequential damages of not less than $150 and not more than $3,000 each, punitive damages, and attorneys' fees.

## COUNT VI

**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND THE NORTH CAROLINA CLASS)**

199.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

200.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Classes.

201.    Under North Carolina law, a claim for unjust enrichment requires showing that one party conferred to another a measurable benefit that was accepted but which was conferred neither officiously nor gratuitously. *Du Plessis v. Du Plessis*, 298 N.C. App. 664, 669 (Ct. App. 2025).

202.    In knowingly extracting unauthorized automatic renewal payments from Plaintiff and the Class, Defendants accepted and retained benefits in the form of such payments. These payments were made neither officiously nor gratuitously.

203.    As a result of their unjust conduct, Defendants have been unjustly enriched.

204.    As a result of Defendants' violations of the North Carolina ARL, Nord Security's automatic renewal clause is "void and unenforceable," N.C.G.S. § 75-41(e), thus giving rise to a claim for unjust enrichment or restitution.

205.    By reason of Defendants' wrongful conduct, Defendants has benefited from receipt and maintenance of improper funds, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

206.    As a result of Defendants' conduct it would be unjust and/or inequitable for Defendants to retain the benefits of its conduct without restitution to Plaintiff and the Classes. Accordingly, Defendants must account to Plaintiff and the Classes for their unjust enrichment.

**COUNT VII**

**CONVERSION**
**(ON BEHALF OF PLAINTIFF AND THE CLASSES)**

207.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

208.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Classes.

209.    Under both North Carolina and Virginia law, there are two elements of conversion: (1) ownership by the plaintiff at the time of the conversion; and (2) wrongful possession or

60

conversion by the defendant. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC,* 365 N.C. 520, 523 (2012); *Arch Ins. Co. v. FVCbank*, 301 Va. 502, 523 (2022).

210.    "Money may be the subject of an action for conversion only when it is capable of being identified and described." *Alkemal Singapore Priv. Ltd. v. DEW Glob. Fin., LLC*, 2018 WL 1942174, at * 15 (N.C. Super. 2018) (quoting *Variety Wholesalers*, 365 N.C. at 528); *see also Fed. Ins. Co. v. Smith*, 63 Fed. Appx. 630, 632–33 (4th Cir. 2003) (under Virginia law, money can be the subject of conversion claim "if the possessor did not receive it in good faith or for valuable consideration").

211.    Plaintiff and the Classes own and have a right to possess the money that is in their respective bank accounts, internet payment accounts, and/or credit cards.

212.    Defendants substantially interfered with Plaintiff and the Classes' possession of this money by knowingly and intentionally making unauthorized charges to their bank accounts, internet payment accounts, and/or credit cards.

213.    Plaintiff and the Classes never consented to Defendants' taking of this money from their bank accounts, internet payment accounts, and/or credit cards.

214.    Defendants' conversion of Plaintiff's and Class Members' funds was done with malice, wantonness, and in the presence of other aggravating circumstances.

215.    At the time they converted Plaintiff's and Class Members' funds, Defendants knew that Plaintiff and Class members had not authorized, consented to, or approved of Defendants' exercise of ownership, possession, custody, and control over those funds.

216.    Defendants wrongfully retained dominion over this monetary property and/or the time-value of the monetary property.

217. Plaintiff and the Classes have been damaged by Defendants' wrongful taking and/or possession of such money from their bank accounts, internet payment accounts, and/or credit cards in an amount that is capable of identification through Defendants' records.

218. By reason of the foregoing, Defendants are liable to Plaintiff and the Classes for conversion in an amount to be proved at trial.

## COUNT VIII

### TRESSPASS TO CHATTELS
### (ON BEHALF OF PLAINTIFF AND THE CLASSES)

219. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

220. Plaintiff brings this claim on his own behalf and on behalf of each member of the Classes.

221. Although "the tort of conversion is closely related to an action for trespass to chattels," the harm addressed by each of these torts differs slightly. *See, e.g., Dishner v. Goneau*, 2017 WL 397878, at *5 (N.C. Super. 2017). Whereas the tort of conversion concerns interference with the plaintiff's right to *ownership* of property, "the tort of trespass to chattels is a trespass to personal property based on an injury to *possession*." *See, e.g., Dishner*, 2017 WL 397878 at *5 (emphasis added). Put another way, the tort of trespass to chattels addresses even "minor and unimportant dispossessions" that "do not amount to conversion," and "allows recovery of damages for the interference with the possession." Restatement (Second) of Torts § 222, comment a.

222. "A successful action for trespass to chattel requires the party bringing the action to demonstrate . . . that there was an unauthorized, unlawful interference or dispossession of the property." *Vaseleniuck*, 219 N.C. App. at 542 (quoting *Fordham v. Eason,* 351 N.C. 151, 155 (1999) (cleaned up)); *see also Michael Pellis Arch. PLC v. M.L. Bell Constr. LLC*, 693 F. Supp.

3d 594, 607 (E.D. Va. 2023) ("[A] trespass to chattels occurs when a person has illegally seized the personal property of another and converted it to his own use." (quotation omitted)).

223.    Here, Plaintiff and Class members had constructive possession over the monies in their bank accounts, internet payment accounts, and/or credit cards.

224.    In consenting to Defendants' access to their bank accounts, internet payment accounts, and/or credit cards, Plaintiff and the Classes did not consent to, authorize, or approve of any unauthorized charges.

225.    Accordingly, in withdrawing money from Plaintiff's and Class Members' bank accounts, internet payment accounts, and/or credit cards in connection with the unauthorized charges, Defendants unlawfully dispossessed Plaintiff and Class members of these funds and interfered with their right of possession.

226.    The dispossessed funds at issue had a specific source—Plaintiff's and Class Members' bank accounts, internet payment accounts, and/or credit cards—and a specific destination—Defendants' bank account. The dispossessed funds were in a specific amount, as well. In Plaintiff's case, the specific amount of the dispossessed funds was $399.24.

227.    Defendants' unlawful interference with Plaintiff's and Class Members' possessory interest in those funds was done with malice, wantonness, and in the presence of other aggravating circumstances.

228.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members were damaged, including by diminution in value of the funds Defendants unlawfully interfered with.

229.    By reason of the foregoing, Defendants are liable to Plaintiff and the Classes for trespass to chattels in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)     Issue an order certifying the Classes defined above, appointing the Plaintiff as Class representative, and designating Wise Law Firm, PLC, Bryson, Harris, Suciu, & Demay, PLLC, and Wittels McInturff Palikovic as Class Counsel;

(b)     Find that Defendants have committed the violations of law alleged herein;

(c)     Determine that Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Classes;

(d)     Enter an order granting all appropriate relief including injunctive relief on behalf of the Classes under the applicable state law;

(e)     Render an award of compensatory damages of at least $100,000,000, the exact amount of which is to be determined at trial;

(f)     Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

(g)     Declare that Defendants have committed the violations of law alleged herein;

(h)     Render an award of punitive damages;

(i)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(j)     Grant all such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.


Dated: April 10, 2026                         Respectfully Submitted,

                                              /s/ David Hilton Wise
                                              David Hilton Wise, VSB No. 30828
                                              Dylan Scout Graham, VSB No. 100051
                                              Robert D. Witte, VSB No. 97294


64

**WISE LAW FIRM, PLC**
10640 PAGE AVENUE, SUITE 320
FAIRFAX, VA 22030
Tel:     (703) 934-6377
Fax:     (703) 934-6379
dwise@wiselaw.pro
dgraham@wiselaw.pro
rwitte@wiselaw.pro

**BRYSON, HARRIS, SUCIU, & DEMAY, PLLC**
Scott C. Harris*
900 W. MORGAN STREET
RALEIGH, NORTH CAROLINA 27603
Tel:     (919) 600-5000
Fax:     (919) 600-5035
sharris@brysonpllc.com

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff*
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel:     (914) 775-8862
Fax:     (914) 775-8862
jbm@wittelslaw.com

*\* Motion for pro hac vice admission forthcoming*

*Counsel for Plaintiff and the Proposed Classes*